UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Secaida Howell, | ) | Civil Action No.: 4:07-cv-1811-RBH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| Marion School District One; Cheryl Cook | ) | |
| Allread, in her individual and official | ) | |
| capacity; Marion School District One | ) | |
| Board of Trustees; William A. Jones, in | ) | |
| his individual and official capacity; Lynn | ) | |
| McElveen, in her individual and official | ) | |
| capacity; Gloria Woodberry, in her | ) | |
| individual and official capacity; Paul | ) | |
| DeMarco, in his individual and official | ) | |
| capacity; James Smith, in his individual | ) | |
| and official capacity; Marion County | ) | |
| Board of Education; | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This matter is before the court on: 1) Defendant Marion County Board of Education's ("County Board") [Docket Entry #66] motion for summary judgment; and 2) Defendants Marion County School District One, Marion County School District One Board of Trustees, Cheryl Cook Allread, William A. Jones, Lynn McElveen, Gloria Woodberry, Paul DeMarco, and James Smith's ("District Defendants") [Docket Entry #67] motion for summary judgment. The court held a hearing on the pending motions for summary judgment on January 28, 2009. For the reasons stated below, the court grants the County Board's motion for summary judgment, and grants in part and denies in part the District Defendants' motion for summary judgment.

**Background**

Plaintiff, Dr. Secaida Howell, was hired as Assistant Superintendent of Instruction for Marion School District One for the 2005-2006 school year pursuant to an employment contract signed on May 6, 2005.  The employment contract was entered into between Defendant Marion School District One and the Plaintiff and was signed by the Plaintiff and Dr. Cheryl Allread, Superintendent for Marion School District One.  As part of his official responsibilities as Assistant Superintendent, Plaintiff would visit and observe classrooms within Marion School District One.

On August 12, 2005, Plaintiff visited Marion Intermediate School to observe classes.  During the visit, Plaintiff observed twelve third grade classes.  According to Plaintiff, nine of the third-grade classes were comprised solely of African-American children; three of the classes were predominantly African-American and contained only several white children.  Plaintiff believed the racial makeup of the third-grade classes was the result of improper racial segregation.[1]  After leaving the school on August 12, Plaintiff returned to the District Office and reported his observations and concerns to Superintendent Allread.  Allegedly, Superintendent Allread responded to Plaintiff with statements such as: "this is the way it has always been and this is the way it is going to stay," "leave it alone," and "he should mind his own business."

Following the August 12, 2005 meeting between Plaintiff and Superintendent Allread, Plaintiff reiterated his concerns to Superintendent Allread in a letter dated August 15, 2005

---

[1]     According to the testimony of former Board Member Washington, the racial composition of the student population of the District is approximately 75%-80% African-American.  [Washington Depo., Docket Entry #67-5].

2

and copied to Cynthia H. Legette, Chairperson of the Marion County Board of Education, and

Rev. William "Bill" Jones, Chairman of the Marion School District One Board of Trustees.

Plaintiff's letter stated, in part:

> ...I wanted to discuss with you my shocking discovery as I visited classes at Marion Intermediate School. As I shared, on the morning of August 12, 2005, I visited the third grade section of the campus. To my startling surprise, I discovered approximately nine classes comprised of all African-American students. I peered into the windows of approximately three remaining classes and discovered that these classes were made up of African-American students and about four to six white students. What I observed appeared to be blatant segregation. I was hopeful that this was an administrative oversight in student classroom assignments, however, in discussing the issue with you, I was once again surprised by the fact that you were fully aware of this classroom arrangement of students and supported it based upon your own personal, professional, and, as you put it, historical Marion School District One reasons. The research is clear that schools and school leaders who advocate for this kind of practice are failing our young people very rapidly. As a fifteen year veteran educator and Assistant Superintendent for Instruction in our school district, I am highly opposed to this method of student assignments at Marion Intermediate School or any other district school for that matter. Once again, please accept my recommendation to begin a process of reconfiguring this student classroom arrangement, with all deliberate speed. Should you decide to do so, I will work tirelessly to insure that the smoothest transition takes place.

Plaintiff alleges that after he wrote the August 15th letter to Superintendent Allread,

and the Chairs of the District Board of Trustees and the County Board of Education, Allread

began to take retaliatory action against him. Plaintiff alleges that Superintendent Allread

ostracized him, made disparaging remarks about him to staff, other employees and members of

the District Board of Trustees, stripped him of his authority to supervise, and conspired to

have him terminated.

On September 28, 2005, Superintendent Allread wrote Plaintiff a letter in which she

criticized his job performance and mandated that he follow a "Respect, Confidence and

3

Support Recovery Plan" in order to avoid dismissal from his position.  Superintendent

Allread's September 28, 2005 letter stated, in part:

> The purpose of this letter is to describe your performance as a member of my administrative staff, its impact on the District's operational environment, and what is to be done.
>
> From the outset your conduct has been marked by (1) deception, (2) a pretense of loyalty and being a team player, (3) narcissism, (4) un-professionalism, (5) blatant insubordination, (6) attempts to usurp authority that clearly rests with the Superintendent and/or Board of Trustees, (7) impulsiveness, and (8) an arrogant proclivity to intimidate, alienate, dominate and even drive away colleagues who have rendered years of stellar educational service to the children of our community. . .
>
> Your unprofessional and irresponsible behavior has impaired your ability to function effectively as a Marion School District One administrator. Prompt and far-reaching corrective steps must be successfully taken if you are to recover the lost respect, confidence, and support necessary for success.
>
> Enclosed is a "Respect, Confidence and Support Recovery Plan."  Failure to promptly execute this plan with the desired results will compel me to seek your dismissal for cause.

As stated, the letter was delivered along with a "Respect, Confidence and Support

Recovery Plan" (the "Plan").  The Plan required Plaintiff to answer a series of questions

concerning his behavior and job performance and complete a number of tasks, which

Superintendent Allread believed would "rehabilitate" Plaintiff's ability to serve as Assistant

Superintendent.  Additionally, Plaintiff alleges the Plan stripped him of his supervisory

authority and prohibited him from having any written communications with any school or

administrative staff without Allread's prior approval.  Plaintiff contends that before he received

the September 28th letter and Plan from Allread, no complaints were filed concerning his job

performance.

4

Allread sent Plaintiff several letters in October and November of 2005 threatening him with termination unless he fully complied with the Plan.  Ultimately, by letter dated November 18, 2005, Allread suspended Plaintiff, with pay, based on her belief that his suspension was "necessary to remove substantial and material disruptive influences in the educational process." In the letter, Allread also notified Plaintiff that pursuant to the Teacher Employment and Dismissal Act ("TEDA"), S.C. Code Ann. §§ 59-25-410 - 59-25-530, she was recommending to the Marion School District One Board of Trustees that his employment be terminated "for conduct manifesting evident unfitness for employment with Marion School District One."

On January 9, 2006, the Marion School District One Board of Trustees convened a hearing on Plaintiff's suspension.  At the hearing, Plaintiff moved to disqualify District Board Member Paul DeMarco from participating in the decision-making process on the basis that he demonstrated a clear predisposition in favor of Allread.  Plaintiff offered testimony at the hearing that on November 28, 2005, DeMarco visited Mount Pisgah Missionary Baptist Church where church members were circulating a petition in favor of the Plaintiff.  Just before the petition was circulated, DeMarco allegedly addressed the congregation and urged them not to sign the petition in favor of the Plaintiff.  DeMarco also stated that Plaintiff had not been denied a grievance hearing, that Superintendent Allread was not a racist, that she was a friend of his, that she was doing a good job and that she cared about the children in the district. According to the witnesses, DeMarco became very angry while speaking to the congregation. After hearing the testimony and arguments of counsel, the District Board voted 5 to 1 to allow DeMarco to participate in the decision-making process.

The suspension hearing adjourned on the evening of January 9, 2006, and reconvened

5

as a consolidated suspension/termination hearing on February 15 and 16, 2006. By Final Order dated February 22, 2006, the District Board affirmed Superintendent Allread's decision to suspend Plaintiff's employment and found that the Superintendent's recommendation of termination was based upon good and sufficient grounds. The vote was 5 to 2 in favor of suspension and termination.[2]

Plaintiff attempted to appeal the District Board's decision to the Marion County Board of Education ("County Board"). The County Board initially indicated that it would hear Plaintiff's appeal; however, before the County Board had the opportunity to conduct a trial de novo on Plaintiff's suspension and termination, the District Board brought a declaratory judgment action in the Marion County Circuit Court of Common Pleas against the County Board, *Marion School District One Board of Trustees v. Marion County Board of Education, et al.*, C/A No.: 2006-CP-33-96, and filed a motion for temporary restraining order seeking to enjoin the County Board from conducting a hearing. The primary issue in the declaratory judgment action was whether TEDA prohibited the County Board from hearing Plaintiff's appeal from the District Board's decision to suspend and terminate Plaintiff's employment.

On April 13, 2006, State Circuit Judge Michael G. Nettles issued an Order granting a temporary injunction enjoining the County Board from hearing Plaintiff's appeal. Specifically, the Order enjoined the County Board "from taking any action to review or consider the petitions or appeals of Dr. Howell, or any subsequent petition or appeal of Dr. Howell from his suspension and termination from Marion School District One." [Order Granting Temporary

---

[2]     Specifically, Board members William A. Jones, James M. Smith, Gloria J. Woodberry, Paul V. DeMarco, and Lynn G. McElveen voted in favor of Howell's suspension and termination. Board members James Washington and Lillian Wilson voted against Howell's suspension and termination. *See* [Final Order of District Board, Docket Entry #67-3].

6

Injunction, Docket Entry #66-9]. The Order stated, among other things, that there was "an overwhelming likelihood of the [District Board's] success on the merits of the underlying declaratory judgment action." In other words, the Circuit Court found that there was an overwhelming likelihood that the County Board lacked the jurisdiction to hear Plaintiff's appeal from the District Board's decision. In the Order, Judge Nettles stated that TEDA expressly vested appellate jurisdiction in the Marion County Court of Common Pleas to review the decision of a District Board to suspend and/or terminate a teacher. Judge Nettles also noted that "[t]he exclusivity of this appellate jurisdiction is clear from the statute's also express provision that the District Board's decision is, otherwise, *final*." [Order Granting Temporary Injunction, Docket Entry #66-9].

Subsequent to the filing of the declaratory judgment action in this matter, an election was held for County Board members in Marion, resulting in the election of two new County Board members. At its meeting on April 18, 2006, the newly composed County Board unanimously agreed not to have any further involvement in Howell's employment matter in light of Judge Nettle's April 13 Order granting the temporary injunction. On May 31, 2006, the County Board filed a motion to have the declaratory judgment action rendered moot. Although the motion was opposed by the District Board, the Circuit Court declared the matter moot on June 12, 2006.

On July 10, 2007, Plaintiff filed the instant lawsuit alleging causes of action against Marion School District One, Marion School District One Board of Trustees, Marion County Board of Education, Cheryl Cook Allread, William A. Jones, Lynn McElveen, Gloria Woodberry, Paul DeMarco, and James Smith for retaliatory discharge in violation of the First

Amendment under 42 U.S.C. § 1983, breach of contract and civil conspiracy.  Plaintiff alleges that his First Amendment rights were violated when he was retaliated against for speaking out about segregation in Marion School District One.  Plaintiff also alleges that the Defendants breached their contract with the Plaintiff when they denied him his due process right to a fair hearing on the issues of his suspension and termination.  Plaintiff also alleges civil conspiracy in that the individual defendants acted in concert to deprive him of his due process right to a fair hearing on the issues of his suspension and termination.[3]

### **Summary Judgment Standard**

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Once the moving party makes the showing, however, the opposing party must respond to the motion with "specific facts showing there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).

When no genuine issue of any material fact exists, summary judgment is appropriate. *Shealy v. Winston*, 929 F.2d 1009, 1011 (4th Cir. 1991).  The facts and inferences to be

---

[3]     Plaintiff's civil conspiracy claim has morphed into an allegation that the District Board conspired with the County Board to deprive Plaintiff of his due process right to a fair hearing.  At the summary judgment hearing, Plaintiff's counsel requested that Plaintiff be permitted to amend his pleadings to allege a conspiracy between the County Board and the District Board.  The Court denies Plaintiff's request to amend his pleadings as untimely.  The most recent scheduling order issued in this case requires that any amended pleadings be filed no later than January 2, 2008. *See* [Docket Entry #45].  By stipulation filed March 17, 2008, the parties agreed to allow Plaintiff until April 9, 2008, to file a more definite statement or amended complaint. *See* [Docket Entry #49].  On April 21, 2008, Plaintiff filed his amended complaint. [Docket Entry #58].  The time to amend the complaint has long passed under the scheduling order deadline of January 2, 2008.  Neither Rule 16 nor Rule 15 requirements for amending the pleadings have been satisfied. *See Nourison Rug Corp. v. Parvizian*, 535 F.3d 295, 298 (4th Cir. 2008).  Accordingly, the court will analyze Plaintiff's civil conspiracy claim as it was pled in the amended complaint, a civil conspiracy amongst the individual defendants to deprive Plaintiff of his due process right to a fair hearing.

drawn from the evidence must be viewed in the light most favorable to the non-moving party. *Id.* However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.*, *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

Summary judgment should only be granted in those cases where there is no issue of fact involved and inquiry into the facts is not necessary to clarify application of the law. *McKinney v. Board of Trustees Mayland Community College*, 955 F.2d 924 (4th Cir. 1992). A district court should not grant summary judgment "unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under the circumstances." *Campbell v. Hewitt, Coleman & Assoc.*, 21 F.3d 52, 55 (4th Cir. 1994).

## Discussion

I.    Issue Preclusion

Defendants argue that Plaintiff's case should be dismissed because the findings of fact and conclusions of law of the District Board in its Final Order terminating Plaintiff's employment constitute state agency findings and should be given preclusive effect in this court.

In its Final Order, the District Board made several findings that, if given preclusive effect in this court, would be fatal to the Plaintiff's case. In particular, the District Board found that: 1) Howell had demonstrated behaviors manifesting evident unfitness for employment; 2) good and sufficient reasons to discharge Howell existed in this case; 3) the

immediate suspension of Howell on November 18, 2005, was needed to remove substantial and material disruptive influences in the educational process; 4) there is no evidence that Howell was treated differently because of his race during his tenure at Marion School District One; 5) there is no evidence that Howell was retaliated against for the substance of the segregation concerns he expressed; 6) there is no evidence that Howell was retaliated against for attempting to file a grievance; 7) the "Respect, Confidence and Support Recovery Plan" imposed by the Superintendent was reasonable and not retaliatory; 8) Howell exhibited inappropriate, irresponsible, unprofessional and insubordinate behavior; 9) Howell's performance in the areas of program management and personnel leadership demonstrated an inability to perform at the administrative level; and 10) the relationship between Howell and those subject to his supervision denigrated into a hostile environment, created by the harsh and unprofessional methods of communication chosen by Howell when dealing with professionals. Most importantly, the District Board concluded that Superintendent Allread's decision to suspend Howell was supported by the evidence and was necessary to remove substantial and material disruptive influences in the educational process.  The District Board also concluded that Howell's uncorrected behaviors manifested evident unfitness for employment and thus, the Superintendent's recommended termination of Howell's employment was based upon good and sufficient grounds.  In summary, the District Board found that Howell's suspension and termination was proper and that Howell was not retaliated against for exercising his First Amendment rights.

Defendants argue that the District Board's Final Order is entitled to preclusive effect under *University of Tennessee v. Elliott*, 478 U.S. 788 (1986).  *Elliott* held that:

10

"when a state agency 'acting in a judicial capacity ... resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate,' federal courts must give the agency's fact-finding the same preclusive effect to which it would be entitled in the State's courts." *Elliott*, 478 U.S. at 799.  Federal courts give preclusive effect to judgments issued by an agency (1) acting in a judicial capacity, (2) resolving disputed issues of fact properly before it, (3) if the parties have had an opportunity to litigate the issues. *Hall v. Marion School Dist. No. 2*, 31 F.3d 183, 191 (4th Cir. 1994).  If the three-part *Elliott* test is not met, "'federal courts are not required to give preclusive effect to the state agency's fact-finding,' even if such findings would be given preclusive effect in the State's courts." *Hall*, 31 F.3d at 191.

The parties appear to agree that the second two elements of the *Elliott* test are met, i.e. that the District Board resolved disputed issues of fact properly before it and that the parties had an opportunity to litigate the issues.  The parties, however, disagree as to whether the District Board was acting in a judicial capacity during Plaintiff's administrative hearing.

"Acting in a judicial capacity requires that an individual in an administrative hearing be afforded an impartial tribunal." *Hall*, 31 F.3d at 191 (citing *Withrow v. Larkin*, 421 U.S. 35, 46 (1975)).  "Clearly decision makers who maintain a bias against one of the parties litigating before them are not acting in a judicial capacity." *Id*.  State administrators are presumed to be "men of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances" and are not considered biased any time they have *ex parte* knowledge of the dispute being adjudicated before them. *Id*. at 191-92 (quoting *United States v. Morgan*, 313 U.S. 409, 421 (1941)).  Also, "mere familiarity with the facts of

11

a case does not render a decisionmaker impermissibly biased." *Id*. at 192.  However, for

purposes of issue preclusion under *Elliott*, "when there has been a finding of actual bias on

the part of the administrative body adjudicating a claim, that decisionmaker is clearly not

acting in a judicial capacity." *Id*.

Plaintiff argues that the actions of Board Member DeMarco at the Mount Pisgah

Missionary Baptist Church indicate a clear predisposition in favor of Superintendent Allread

and should have disqualified him from participating in the decision-making process.  But,

despite Plaintiff's objections at the administrative hearing, the District Board permitted

DeMarco to participate in the deliberations and vote on Plaintiff's termination and suspension.

Plaintiff argues that, due to DeMarco's participation in the decision-making process, the

District Board was an impartial tribunal and was incapable of making a fair decision.

Therefore, Plaintiff argues that the District Board's findings should not be given preclusive

effect by this court.

In response, Defendants argue that decision makers are entitled to a presumption of

honesty and integrity and that Plaintiff cannot establish actual bias. *See Kizer v. Dorchester

County Vocational Educ. Bd. of Trustees*, 340 S.E.2d 144, 148 (S.C. 1986) (stating "[s]chool

board members are clothed with a presumption of honesty and integrity in the discharge of

their decision-making responsibilities" and "in order to disqualify a hearing tribunal, actual

bias rather than a mere potential for bias must be shown").  Additionally, the Defendants

argue that even if DeMarco was arguably biased, he only constitutes one member of the

Board, and Plaintiff cannot establish that the other District Board members were biased or

influenced by DeMarco in any way.  Defendants note that there were enough votes to

12

terminate Plaintiff (4 to 2) even if DeMarco's vote was excluded from the final tally.  In essence, Defendants argue that DeMarco's alleged bias is inconsequential because he did not cast the deciding vote.  Defendants contend that even if DeMarco was biased, any alleged bias had no effect on the outcome of the proceedings.  The Defendants cite no authority for this proposition.  Likewise, Plaintiff has submitted no authority on the issue.

In *Aetna Life Insurance Co. v. Lavoie*, the United States Supreme Court held that one Alabama Supreme Court Justice was disqualified from participating in the decision-making process by virtue of his pecuniary interest in the outcome of the case, but that there was no constitutional bar to the participation of the other eight justices. *Aetna Life*, 475 U.S. 813, 824-27 (1986).  Because the disqualified justice's vote was decisive, and because he wrote the majority opinion, the Court vacated the Alabama Supreme Court's decision. *Id*. at 828.  The majority of the Court expressed no view as to whether the same result would have been required if the biased justice's vote had not been decisive.  Although the majority opinion of the Court in *Aetna Life* expressly declined to address the question of whether bias on the part of one member of a multi-person tribunal violates due process in the absence of any showing that the member's bias affected the tribunal's decision, three of the eight justices wrote or joined concurrences stating that any decision issued by a multi-member panel must be vacated if a biased member participated in the decision. *See* 475 U.S. at 831 (Brennan, J., concurring) (stating "while the influence of any single participant in this process can never be measured with precision, experience teaches us that each member's involvement plays a part in shaping the court's ultimate disposition"); *id*. at 833 (Blackmun, J., concurring, joined by Marshall, J.) (stating because the decision-making process occurs in private, a reviewing court may never

13

discover the actual effect a biased tribunal member had on the outcome of a particular case). Additionally, a majority of the circuits to address the question have held that a decision issued by a multi-member panel must be vacated if a biased member participated in the decision. *See Berkshire Employees Ass'n of Berkshire Knitting Mills v. N.L.R.B.*, 121 F.2d 235, 239 (3rd Cir. 1941) (stating "[l]itigants are entitled to an impartial tribunal whether it consists of one man or twenty and there is no way which we know of whereby the influence of one upon the others can be quantitatively measured"); *Cindarella Career and Finishing Schools v. Federal Trade Comm'n*, 425 F.2d 853, 592 (D.C. Cir. 1970) (vacating and remanding agency decision "despite the fact that former Chairman Dixon's vote was not necessary for a majority and stating there is no way of determining the extent to which one biased member's views affect the deliberations of a supposedly impartial tribunal); *Hicks v. City of Watonga*, 942 F.2d 737, 748 (10th Cir. 1991) (concluding that the plaintiff could make out a due process claim by showing bias on the part of only one member of the tribunal); *Wilkerson v. Johnson*, 699 F.2d 325, 328-29 (6th Cir. 1983) (finding that license applicants were denied due process based on the bias of one member of a four person application board); *Antoniu v. Sec. Exch. Comm'n*, 877 F.2d 721, 726 (8th Cir. 1989) (vacating commission decision and remanding for de novo reconsideration, even though biased commissioner belatedly recused himself and did not vote on final decision); *Stivers v. Pierce*, 71 F.3d 732, 748 (9th Cir. 1995) (vacating unanimous decision because of bias of one panel member; "plaintiff need not demonstrate that the biased member's vote was decisive or that his views influenced those of other members"); *but see*, *Bradshaw v. McCotter*, 796 F.2d 100, 101 (5th Cir. 1986) (denying habeas relief and finding no prejudice as a result of the state appellate judge's alleged appearance of bias).

14

DeMarco's affirmative actions at the Mount Pisgah Missionary Baptist Church on or about November 28, 2005, indicate a real possibility of bias, and, at the very least, create a question as to whether DeMarco was actually biased against the Plaintiff.  The testimony indicates that DeMarco attended the Church, without invitation, to speak regarding Plaintiff's employment matter with the District on the very day the Church was circulating a petition in favor of the Plaintiff.  According to witnesses, DeMarco urged the congregation not to sign the petition and became agitated while discussing some of the issues.  Witnesses also testified that DeMarco's remarks were clearly favorable to the Superintendent, yet tended to disparage Plaintiff.

As for the Defendants' position that DeMarco's alleged bias was inconsequential because he did not cast the deciding vote, the court rejects Defendants' arguments and finds the reasoning of the majority of courts addressing the issue to be persuasive.  In this case, there is no way to know the extent or degree to which DeMarco's alleged bias may have tainted the deliberative process or influenced any of the other District Board members.  Based on DeMarco's actions at the church, one could argue that he was certainly a vocal supporter of Superintendent Allread.  One can only speculate as to whether he attempted to persuade the other District Board members during deliberations with as much passion as he attempted to persuade the church congregation.  Given the reasoning of the majority of cases, this court cannot conclude that Plaintiff's hearing before the District Board was a hearing before an impartial tribunal to the extent that it should be entitled to preclusive effect in this court.

In summary, based on the record before it, this court cannot conclude as a matter of law that the Defendants are entitled to issue preclusion under *University of Tennessee v.*

15

*Elliott.*  Because there is a question as to whether DeMarco was actually biased against the Plaintiff, this court is not prepared to give preclusive effect to the District Board's final decision regarding the suspension and termination of the Plaintiff.

II.     First Amendment Retaliation Claim

Having decided that *University of Tennessee v. Elliott* does not foreclose Plaintiff's claims at the summary judgment stage, the court now proceeds to the merits of Plaintiff's claims.

Plaintiff claims that he was retaliated against in violation of the First Amendment of the United States Constitution when he spoke out about racial segregation in Marion School District One.  Plaintiff alleges that when he raised the issue to Superintendent Allread, he was told to "leave it alone."  Shortly thereafter, on August 15, 2005, Plaintiff wrote a letter to the Superintendent, memorializing their conversation about classroom segregation.  The letter was copied to the Cynthia H. Legette, Chairman of the Marion County Board of Education, and William Jones, Chairman of the Marion School District One Board of Trustees.  The Plaintiff claims that after he wrote the letter, the Defendants retaliated against him by requiring him to participate in a "Respect, Confidence and Support Recovery Plan."  When Plaintiff did not comply with the Plan, he was suspended and subsequently terminated.

"A state may not dismiss a public school teacher because of the teacher's exercise of speech protected by the First Amendment." *Stroman v. Colleton County School Dist.*, 981 F.2d 152, 155-56 (4th Cir. 1992) (citing *Pickering v. Board of Educ.*, 391 U.S. 563 (1968)). Speech by a public school teacher is protected by the First Amendment when (1) the teacher speaks as a citizen about matters of public concern and (2) the teacher's interest in exercising

16

free speech is not outweighed by the countervailing interest of the state in providing the public service the teacher was hired to provide. *Stroman*, 981 F.2d at 156.  Accordingly, when the accommodation of the teacher's right to comment as a citizen on public issues conflicts with the state's interest in providing a public education, the interests must be balanced to determine which is to prevail. *Id.*

In order to prove that a retaliatory employment action violated a public employee's free speech rights, the employee must satisfy the *McVey v. Stacy*, 157 F.3d 271 (4th Cir. 1998), three prong-test: (1) public employee must have spoken as a citizen, not as an employee, on a matter of public concern,[4] (2) employee's interest in expression at issue must have outweighed employer's interest in providing effective and efficient services to the public, and (3) there must have been a sufficient causal nexus between the protected speech and the retaliatory employment action.[5] *Ridpath v. Board of Governors Marshall University*, 447 F.3d 292, 316 (4th Cir. 2006).  The U.S. Supreme Court has further restricted the scope of employees' First Amendment protection holding that "when public employees make statements *pursuant to their official duties*, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).

Defendants argue that they are entitled to summary judgment on Plaintiff's First Amendment claim because Plaintiff's statements regarding racial segregation were made pursuant to his official duties as Assistant Superintendent of Marion School District One and

---

[4]     No one disputes that the subject matter of Plaintiff's speech, the issue of racial segregation in the classroom, is a matter of public concern.

[5]     Causation proof requirement discussed at pg. 22-23 of this Order.

17

are therefore not constitutionally protected under *Garcetti*.

The primary communications relied on by Plaintiff as the basis of his First Amendment claim are his statements during the August 12, 2005, meeting with Superintendent Allread and his August 15, 2005, letter to Allread, Legette and Jones.[6]  Defendants argue that Plaintiff was observing the classrooms on August 12th as part of his official responsibilities as Assistant Superintendent for Instruction.  Defendants also argue that as an employee and administrator of the District, it was Plaintiff's responsibility to report to Superintendent Allread his concerns over what he felt were racially discriminatory student assignments.  Accordingly, Defendants conclude that because Plaintiff made those statements pursuant to his official duties and not as a private citizen, his statements are not entitled to First Amendment protection and his claim should fail.

*Garcetti* concerned a deputy district attorney, Richard Ceballos, who claimed retaliation for writing a disposition memorandum in which he recommended dismissal of a case on the basis of alleged governmental misconduct.  Ceballos believed the affidavit used to obtain a

---

[6]     In his memorandum in opposition to Defendants' motions for summary judgment, Plaintiff asserts that he made several types of speech on the issue of racial segregation: a) August 12, 2005, he spoke directly to Superintendent Allread in reporting the segregated classes he observed that day; b) August 15, 2005, he wrote Allread a follow-up letter, which was also sent to the County and District Board chairs; c) he preached a sermon about racial segregation in the District at a local church; and d) he spoke, through his attorney, to the local press on several occasions.
        At the hearing, it was determined that Plaintiff never actually preached a sermon about racial segregation to any church.  Plaintiff's attorney admitted that his assertion that Plaintiff had preached a sermon on the issue was not an accurate representation to the court.
        With regard to the contention that Plaintiff spoke, through his attorney, to the local press, the record contains a newspaper article dated February 1, 2006, in which Plaintiff's attorney gave a statement regarding Plaintiff's suspension and the segregation issue.  This statement occurred before the District Board's final decision, but after the majority of the complained of acts.  No party has briefed the issue of whether a plaintiff may premise a First Amendment retaliation claim on his attorney's statements to the local press.  Nevertheless, the court need not reach this issue because, as discussed more fully below, the court finds that Plaintiff's First Amendment retaliation claim can proceed based on Plaintiff's August 15th letter to Allread, copied to the District and County Board chairs.

search warrant contained serious misrepresentations.  He conveyed his opinion and recommendation in a memo to his supervisor. *Garcetti*, 547 U.S. at 420.  Ceballos claimed that as a result of writing the memo he was subjected to a series of retaliatory employment actions including reassignment from his calendar deputy position to a trial deputy position, transfer to another courthouse, and denial of a promotion. *Id.* at 415.  Ceballos then brought suit under 42 U.S.C. § 1983 alleging that he was retaliated against in violation of the First and Fourteenth Amendments based on his disposition memo. *Id.*  Ultimately, the Supreme Court found that Ceballos had written the disposition memo as part of his official duties and not as a private citizen.  As a result, the Supreme Court concluded that Ceballos' memo was not entitled to First Amendment protection.

In analyzing whether the memo written by Ceballos was entitled to First Amendment protection, i.e. whether the memo was written pursuant to Ceballos' official duties or as a private citizen, the Supreme Court stated:

> That Ceballos expressed his views inside his office, rather than publicly, is not dispositive. Employees in some cases may receive First Amendment protection for expressions made at work. *See, e.g., Givhan v. Western Line Consol. School Dist.*, 439 U.S. 410, 414, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979). Many citizens do much of their talking inside their respective workplaces, and it would not serve the goal of treating public employees like "any member of the general public," *Pickering*, 391 U.S. at 573, to hold that all speech within the office is automatically exposed to restriction.
>
> The memo concerned the subject matter of Ceballos' employment, but this, too, is nondispositive. The First Amendment protects some expressions related to the speaker's job. *See, e.g., ibid.; Givhan*, *supra*, at 414, 99 S.Ct. 693. As the Court noted in *Pickering*: "Teachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allotted to the operation of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory

> dismissal." 391 U.S., at 572, 88 S.Ct. 1731. The same is true of many other categories of public employees.
>
> The controlling factor in Ceballos' case is that his expressions were made pursuant to his duties as a calendar deputy. See Brief for Respondent 4 ("Ceballos does not dispute that he prepared the memorandum 'pursuant to his duties as a prosecutor' "). That consideration-the fact that Ceballos spoke as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case-distinguishes Ceballos' case from those in which the First Amendment provides protection against discipline.
>
> Ceballos wrote his disposition memo because that is part of what he, as a calendar deputy, was employed to do. It is immaterial whether he experienced some personal gratification from writing the memo; his First Amendment rights do not depend on his job satisfaction. The significant point is that the memo was written pursuant to Ceballos' official duties. Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created.

*Garcetti*, 547 U.S. at 420-22.  With that guidance, the Supreme Court nevertheless recognized that it had failed to set forth a framework for defining the scope of an employee's duties. *Id.* at 424.  The Supreme Court emphasized that because the parties did not dispute that Ceballos wrote his disposition memo pursuant to his employment duties, they had no occasion to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there was room for serious debate. *Id.*  The Court instructed that the proper inquiry was a practical one. *Id.*

In this case, we do not have the benefit of a stipulation by the Plaintiff that his statements were made pursuant to his official duties.  That said, there appears to be some serious room for debate as to whether Plaintiff spoke pursuant to his official duties when he spoke out about the alleged classroom segregation.  In particular, there is nothing in the record

20

that suggests that raising the issue of segregation to the District and County Board chairs was part of his official duties as Assistant Superintendent.  Arguably, the statements made to Superintendent Allread fall within Plaintiff's official duties as he was a subordinate of the Superintendent.  It is reasonable and practical to conclude that, as part of his official duties, Plaintiff was to report to the Superintendent on matters observed in the course of his employment.  It is less reasonable to conclude that, after being initially rebuffed by the Superintendent, the Plaintiff was acting pursuant to his official duties when he copied his August 15th letter to the County Board and District Board Chairs.

In noting that "[t]he significant point is that the memo was written pursuant to Ceballos' official duties," *Garcetti* suggests that the court's focus in determining whether the speech is made pursuant to the plaintiff's official duties is whether the particular act of speech itself is required by the plaintiff's employment. *See id.*  In *Garcetti*, the particular act of speech, writing the disposition memo, was required by Ceballos' employment.  In the case at bar, the record is silent as to whether the particular act of publishing the August 15th letter to the District and County Board Chairs was an act of speech required by the Plaintiff's employment.  At the summary judgment stage, it is not clear that the publishing of the letter was part of Plaintiff's official duties such that the Defendants would be entitled to summary judgment. *See Davis v. McKinney*, 518 F.3d 304, 313 (5th Cir. 2008) (citing *Freitag v. Ayers*, 468 F.3d 528 (9th Cir. 2006), for proposition that if a public employee takes his job concerns to persons outside the work place in addition to raising them up the chain of command, then those external communications are ordinarily not made as an employee, but as a citizen); *Kodrea v. City of Kokomo*, 458 F. Supp. 2d 857, 868 (S.D. Ind. 2006) (finding that because

21

factual dispute existed about whether the plaintiff acted as a concerned citizen, *Garcetti* does not preclude plaintiff from presenting his claims to a jury for consideration); *Barclay v. Michalsky*, 451 F. Supp. 2d 386, 396 (D. Conn. 2006) (finding that *Garcetti* is not controlling because "the record does not establish incontrovertibly that plaintiff made her complaints concerning use of excessive force/restraints and employees sleeping on duty as part of the discharge of her duties as a nurse").

We now turn to the balancing test established by the Supreme Court in *Pickering v. Board of Educ.*, 391 U.S. 563 (1968). The *Pickering* balancing test requires the court to consider whether the employee's interest in the expression at issue outweighed the employer's interest in providing effective and efficient services to the public. At the hearing on this matter, counsel for the District Defendants conceded that the *Pickering* balancing test weighs heavily in favor of a plaintiff raising issues of racial segregation. The court agrees. Plaintiff's interest in the expression at issue in this case outweighs the employer's interest in providing effective and efficient services to the public.

Finally, to establish that a retaliatory employment action violated Plaintiff's First Amendment Rights, Plaintiff must establish a sufficient causal nexus between the protected speech and the retaliatory employment action. *Ridpath*, 447 F.3d at 316. The causation requirement is met if the protected expression was the "but for" cause of the adverse employment action. *Id.* at 318. This inquiry involves two steps, and the employer will not be liable if the discharge would have occurred for other reasons, such as the employee's incompetence. *Hall*, 31 F.3d at 193. In the first step, the employee bears the burden of establishing the requisite causation to prove that the protected speech was a motivating factor

or played a substantial role in the discharge. *Mt. Healthy City School Dist. Bd. of Ed. v. Doyle*, 429 U.S. 274, 287 (1977). If the employee is able to prove such, the second step shifts the burden to the employer to put forward evidence that it would have fired the employee even in the absence of the protected speech. *Id.*

In this case, there is sufficient evidence to create a genuine issue of material fact as to whether the Plaintiff's speech was the "but for" cause of his suspension and termination. Plaintiff argues that shortly after he raised the segregation issue, the Superintendent began to have "problems" with his job performance and sent him a "Respect, Confidence and Support Recovery Plan," which required Plaintiff to engage in a number of arguably demeaning tasks in order to save his job. Plaintiff claims that there had never been any complaints about his job performance before his August 12th meeting and August 15th letter. When Plaintiff did not comply with the improvement plan, he was suspended and ultimately terminated. Plaintiff claims the improvement plan and the reasons given for his termination were a pretext. Viewing the evidence in the light most favorable to the Plaintiff, there is a genuine issue of material fact as to whether Plaintiff has demonstrated a sufficient causal relationship between his protected speech and his suspension and termination.

In conclusion, the District Defendants are not entitled to summary judgment on Plaintiff's First Amendment claim. Although Plaintiff was clearly speaking on a matter of public concern, there is a question of fact as to whether Plaintiff was speaking as a private citizen or pursuant to his official duties. Specifically, the question is whether the act of publishing Plaintiff's August 15th letter to the District and County Board Chairs was done pursuant to Plaintiff's official duties as Assistant Superintendent. As conceded by the

Defendants, Plaintiff's interest in expressing his views on racial segregation in the District outweigh the District's interest in providing effective and efficient services to the public. Also, there is a genuine issue of material fact as to whether Plaintiff's protected expression was the "but for" cause of the alleged retaliation.

The individual defendants (District Board members and the Superintendent) argue in their brief that they are entitled to qualified immunity on Plaintiff's First Amendment claim because reasonable officials in the individual defendants' positions would not have understood that performing the discretionary function of their official job duties would have violated Plaintiff's right to free speech.

Qualified immunity shields government officials performing discretionary functions from liability in their individual capacities for civil damages under § 1983 to the extent "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Government officials are entitled to the defense of qualified immunity unless a § 1983 claim satisfies the following two-prong test: 1) the allegations underlying the claim, if true, substantiate the violation of a federal statutory or constitutional right; and 2) the violation was of a "clearly established" right "of which a reasonable person would have known." *Ridpath*, 447 F.3d at 306; *Harlow*, 457 U.S. at 818.

Regarding the first prong of the qualified immunity test, Plaintiff's underlying allegations, if proven true, would constitute a violation of Plaintiff's First Amendment right to free speech. As to the second prong of the qualified immunity test, the court finds the Fourth Circuit's decision in *Ridpath* instructive. *See* 447 F.3d 320-22.

24

The prohibition against retaliation for protected speech was clearly established at the time Plaintiff was suspended and terminated from Marion School District One. *Id*. at 320.  As to whether reasonable persons would have been aware that suspending and terminating Plaintiff because of his remarks violated his constitutionally protected free speech rights, it should be noted that "public employers enjoy only qualified - not absolute - immunity, and a public employer can find no refuge in qualified immunity when an adverse employment decision clearly contravenes a public employee's First Amendment rights." *Id*. at 320-21.  Plaintiff has alleged that after raising the issue of classroom segregation in Marion School District One, he was retaliated against and ultimately suspended and terminated.  "Such activity does not merely implicate the gray edges of the right [Plaintiff] asserts, it goes to its very core." *See id*. at 321.  No reasonable person would believe that it was permissible under the First Amendment to terminate an Asst. Superintendent because he raised issues of racial inequality and segregation in the classroom.  Accordingly, the court finds that Plaintiff's First Amendment retaliation claim sufficiently alleges a violation of clearly established law of which a reasonable person would have known.  The individual defendants are therefore not entitled to the qualified immunity defense.

As to the County Board, for the reasons stated below, the County Board is entitled to summary judgment on Plaintiff's First Amendment claims.

Plaintiff argues that the County Board is liable by virtue of their supervisory duties with respect to the District Board.  Plaintiff also contends that the County Board should be liable because it ratified Plaintiff's suspension and termination.  The basis for Plaintiff's ratification theory appears to be that the County Board allegedly colluded with the District

Board to deprive Plaintiff of a fair hearing. However, viewing the evidence in the light most favorable to Plaintiff, no reasonable juror could conclude that the County Board and District Board were engaged in a conspiracy to deprive Plaintiff of a fair hearing.

Despite Plaintiff's unsupported speculation to the contrary, the undisputed facts make clear that the County Board sought to ensure that Plaintiff received fair treatment from the District Board. The record shows that the County Board attempted to act as somewhat of a "mediator" of the employment dispute between Superintendent Allread and the Plaintiff. The record also reflects that the District Board and County Board were engaged in a sort of power struggle over how to proceed with the matter.

In a letter dated December 2, 2005, written to Plaintiff's counsel and the Attorney representing Superintendent Allread and the District Board, the County Board, through its Chairperson, stated:

> While historically it has been the policy of the Marion County Board of Education to refrain from involving itself in District-level employment matters . . .we are very concerned with several substantive and procedural aspects of the current proceedings. . . It is clear to us that the parties are moving in the direction of an extensive legal dispute and related proceedings, which will be very expensive, disruptive to the educational program in District One, and potentially very damaging to our community . . .
>
> Accordingly, the County Board has directed its attorney, its Chairperson and Frank Hart to promptly arrange a meeting with the Marion One District Board to review carefully with the Board the proper procedures they must follow from this point forward in order to preserve their ability to provide Dr. Howell with a fair, proper, and impartial hearing pursuant to [TEDA]. . .

[Docket Entry #66-18, at 16-17].

One week later, the County Board wrote to William Jones, Chairman of the District

26

Board, expressing the County Board's desire that the dispute between Superintendent Allread and the Plaintiff be resolved by agreement.  Noting its disappointment with the actions of the District Board and its concerns for the fair treatment of the Plaintiff, the County Board instructed the District Board not to proceed with any public hearings in the matter until the parties had had a reasonable opportunity to resolve the dispute.  In a statement that underscores the power struggle between the County Board and District Board and indicates a lack of collusion between the two, the letter threatened the District Board with a restraining order if the District Board proceeded contrary to the County Board's instructions. *See* [Docket Entry #66-18, at 18-19].  This is hardly evidence of a conspiracy to injure the Plaintiff, to collude with the District Board, or ratify actions of the District Board.

In a letter dated January 5, 2006, the County Board followed up with the District Board and expressed its opinion that both parties, Marion One and the Plaintiff, had made some mistakes, but reiterated that: "we are concerned about the orderly and efficient operation of Marion One, but at the same time, we are concerned that Dr. Howell be treated fairly and his rights respected." [Docket Entry #66-18, at 20].  The County Board requested that the District Board postpone Plaintiff's suspension hearing, which the District Board had scheduled for January 9.  The County Board stated:

> In our opinion, scheduling the hearing was contrary to our previous request.  In our view, proceeding with the suspension hearing at this time will serve no constructive purpose and may make a bad situation much worse.

> In short, it is the express desire of the County Board . . .that counsel for both parties work with representatives of Childs & Halligan, the County Board attorneys, to attempt to work out their differences and reach a resolution under the circumstances in the best interests of all concerned.

27

[Docket Entry #66-18, at 21].

Despite the County Board's repeated requests, the District Board proceeded with Plaintiff's suspension hearing on January 9.  Following the District Board's consolidated suspension/termination hearing on February 15 and 16, 2006, and its Final Order dated February 22, 2006, Plaintiff attempted to appeal the District Board's decision to the County Board.  The County Board was initially willing to hear Plaintiff's appeal; however, before the County Board could grant Plaintiff a hearing, the District Board sued the County Board over its authority to hear Plaintiff's appeal.  After the District Board successfully sought a Temporary Injunction enjoining the County Board from taking any further action to review or consider the appeals of the Plaintiff, the County Board declined to have any further involvement in Plaintiff's employment matter.  At every turn, the County Board was taking positions adverse to the District Board.

Viewing the evidence in the light most favorable to the Plaintiff, Plaintiff has failed to raise a genuine issue with regard to any collusion between the County Board and the District Board.  No reasonable juror could conclude that the County Board engaged in a conspiracy to predetermine the outcome of Plaintiff's hearing or otherwise deprive Plaintiff of a fair hearing, then expend some of the very limited funds at the County Board's disposal to litigate the issue in State Court of whether the County Board had a right to review the District Board's decision concerning Plaintiff's discharge.  The undisputed facts simply do not support the Plaintiff's contention that the County Board ratified any of the District Defendants' acts or omissions by conspiring to deny Plaintiff a fair hearing.

Additionally, Plaintiff argues that the County Board should be liable for Plaintiff's

28

suspension and termination because the County Board is charged with supervising the District Board under S.C. Code Ann. § 59-19-90(2).  Section 59-19-90(2) provides, in part, that school boards of trustees shall . . . "*Employ and discharge teachers*. Employ teachers from those having certificates from the State Board of Education, fix their salaries and discharge them when good and sufficient reasons for so doing present themselves, *subject to the supervision of the county board of education*." Plaintiff argues that this provision provides the basis for the County Board's supervisory liability.  However, Plaintiff has offered no authority for the proposition that § 59-19-90(2) is sufficient to establish § 1983 supervisory liability on the part of a county board of education.  In fact, in *Hall v. Marion School District No. 2*, 860 F. Supp. 278, 291 (D.S.C. 1993), Judge Traxler found that, after reviewing S.C. Code Ann. § 59-19-90(2), the District Board was the final policymaker of the district with regard to employing and discharging teachers.  On review, the Fourth Circuit agreed and stated that under S.C. Code Ann. § 59-19-90(2), the District Board was the final policymaker with regard to the employment and discharge of teachers. *Hall*, 31 F.3d at 196.

The Fourth Circuit has set forth three elements necessary to establish supervisory liability under § 1983. *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).  The plaintiff must show that: 1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices,"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *Shaw*, 13 F.3d at 799.

29

In this case, assuming that Plaintiff could arguably show that the County Board had actual or constructive knowledge that the District Board was engaged in conduct that posed a "pervasive and unreasonable risk" of constitutional injury, the Plaintiff cannot establish that the County Board's response was so inadequate as to show deliberate indifference or tacit authorization. The undisputed facts indicate that the County Board attempted to review the District Board's decision, but was enjoined from doing so by a State Circuit Judge. In essence, the Plaintiff seeks to hold the County Board liable as a supervisor of the District Board for either: 1) not violating the Order Granting Temporary Injunction; or 2) not continuing with probable futile litigation. The County Board cannot be charged with deliberate indifference to or tacit authorization of a decision that it was ordered *not to review* by a State Circuit Court Judge. Plaintiff has not come forward with any facts which tend to create a triable issue as to any tacit authorization or deliberate indifference of the County Board. Accordingly, Plaintiff's claims of supervisory liability under § 1983 against the County Board fail.

Finally, for the sake of completeness, the court will consider whether the County Board is subject to municipal liability under *Monell v. Dep't of Social Servs. of the City of N.Y.*, 436 U.S. 658, 691 (1978), for the acts or omissions of the District Defendants. It is well-established that the County Board's liability under 42 U.S.C. § 1983 cannot be predicated on a *respondeat superior* theory. *Monell*, 436 U.S. at 691. Rather, a municipality is subject to § 1983 liability only when the governmental entity, acting pursuant to an official policy or custom, commits a constitutional tort. *Monell*, 436 U.S. at 694. Proof of the existence of a municipal policy or custom under § 1983 does not require a plaintiff to evidence numerous

similar violations. *Hall*, 31 F.3d at 195.

In *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986), the Supreme Court held that in certain circumstances, a single violation is sufficient to invoke municipal liability. The Court reasoned that to hold a municipality liable for a single violation, the decisionmaker must possess "final authority to establish municipal policy with respect to the action ordered." *Pembaur*, 475 U.S. at 481.

In *City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988), the Supreme Court further defined when a municipality can be held liable for a single constitutional violation. First, ... municipalities may be held liable under § 1983 only for acts for which the municipality itself is actually responsible, "that is, acts which the municipality has officially sanctioned or ordered." Second, only those municipal officials who have "final policymaking authority" may by their actions subject the government to § 1983 liability. Third, whether a particular official has "final policymaking authority" is a question of state law. Fourth, the challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in that area of the city's business. *Praprotnik*, 485 U.S. at 123.

Plaintiff has failed to come forward with sufficient evidence of the municipal liability of the County Board under *Monell* and its progeny. As noted, the question of whether a particular official or entity has final policymaking authority is a question of state law. In addition to the *Hall* decisions, which are adverse to the Plaintiff's position, State Circuit Judge Nettles made clear in his Order Granting Temporary Injunction that the County Board most likely lacked the authority to review an employment decision of the District Board. There is

simply insufficient evidence that the County Board ratified, officially sanctioned, or ordered Plaintiff's suspension and termination. Under the facts of this case, the County Board cannot be held liable for the acts or omissions of the District Defendants. Accordingly, summary judgment is granted in favor of the County Board on Plaintiff's First Amendment claim.

III.     Breach of Contract

Plaintiff alleges that the Defendants breached the terms of his employment contract by refusing to provide him due process in the form of a fair hearing on the issues of his suspension and termination. Even though Plaintiff alleges a procedural due process violation as the basis of his breach of contract claim, his claim is brought under state common law breach of contract theory and not under 42 U.S.C. § 1983.[7] Because an adequate post-deprivation state remedy was available to the Plaintiff, he cannot establish a violation of his procedural due process rights. In other words, because Plaintiff can establish no injury, his breach of contract claim premised on a procedural due process violation fails.

Under the Teacher Employment and Dismissal Act ("TEDA"), S.C. Code Ann. §§ 59-25-410 - 59-25-530, the South Carolina Legislature has granted authority to school boards to

---

[7]     To state a claim for failure to provide due process, a plaintiff must have taken advantage of the processes that are available to him or her, unless those processes are unavailable or patently inadequate. *Ashley v. N.L.R.B.*, 255 Fed.Appx. 707, 2007 WL 4115948, at *2 (4th Cir. 2007) (citing *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000)). This is so because a due process violation "is not complete" when the asserted deprivation occurs; rather it is only complete when the government "fails to provide due process." *Zinermon v. Burch*, 494 U.S. 113, 126 ((1990). Accordingly, where "there is a process on the books that appears to provide due process, the plaintiff cannot skip that process and use the federal courts as a means to get back what he wants." *Alvin*, 227 F.3d at 116.

In the instant case, the Plaintiff had an adequate post-deprivation state remedy. Plaintiff could have appealed the District Board's decision to terminate his employment to the Circuit Court. Because adequate post-deprivation state remedies were available to provide Plaintiff with the opportunity to challenge the District Board's decision, Plaintiff cannot state a procedural due process claim under § 1983.

discharge teachers.[8] *Adamson v. Richland County School Dist.*, 503 S.E.2d 752, 755-56 (S.C. Ct. App. 1999). South Carolina Code Ann. § 59-25-460 provides that "[n]o teacher shall be dismissed unless written notice specifying the cause of dismissal is first given the teacher by the District Board of Trustees and an opportunity for a hearing has been afforded the teacher." S.C. Code Ann. § 59-25-460. If the teacher receives an unfavorable decision from the District Board, the teacher may appeal the District Board's decision to the Circuit Court of Common Pleas under S.C. Code Ann. § 59-25-480, which states: "[t]he decision of the district board of trustees *shall be final*, unless within thirty days thereafter an appeal is made to the court of common pleas of any county in which the major portion of such district lies." S.C. Code Ann. § 59-25-480 (emphasis added).

In this case, the Plaintiff received a hearing before the District Board. Having received an unfavorable ruling from the District Board, Plaintiff had the right to appeal to the Marion County Circuit Court of Common Pleas under S.C. Code Ann. § 59-25-480. The record indicates that Plaintiff and his counsel were duly advised of this right.[9] Even though Plaintiff may have been able to argue that he received an unfair hearing before the District Board as a result of Board Member DeMarco's alleged bias, this alone does not constitute a violation of Plaintiff's procedural due process rights because an adequate post-deprivation remedy through TEDA was available to the Plaintiff. Stated another way, Plaintiff's procedural due process rights were nevertheless protected by virtue of his right to challenge the District Board's

---

[8]    No one disputes that Plaintiff qualifies as a "teacher" under TEDA.

[9]    In a letter dated February 22, 2006, Kenneth Childs, Attorney for the County Board, advised Plaintiff's counsel that even though the County Board was willing to hear Plaintiff's appeal, Plaintiff should still file an appeal to the Circuit Court pursuant to S.C. Code Ann. § 59-25-480, in order to fully protect his client's rights. [Docket Entry #86-3, at pg. 19].

decision.  Plaintiff could have raised the issue of DeMarco's bias, or any other issue of unfairness in the administrative proceedings, in the Circuit Court, yet chose not to appeal and instead file this lawsuit.

In sum, Plaintiff's procedural due process rights were not violated because any actual or perceived unfairness in the administrative hearing before the District Board could have been addressed and remedied through TEDA's established appellate process to the State Circuit Court. *Kizer*, 340 S.E.2d at 148.  Plaintiff's failure to exhaust and follow TEDA's express appellate process precludes his pursuit in federal court of a state law breach of contract claim. To allow Plaintiff to proceed with this cause of action in spite of his failure to appeal the District Board's decision would render TEDA's appellate provision, S.C. Code Ann. § 59-25-480, meaningless.  This court is not in a position to create, by judicial fiat, an alternative appellate process for teachers, who have been aggrieved by suspension and/or termination decisions of district boards of trustees, when the South Carolina Legislature has already taken great measures to afford teachers procedural due process with regard to their employment.  In the related state court litigation, State Circuit Judge Nettles recognized the exclusive nature of TEDA's appellate provision.  This court must be cognizant of the basic principles of federalism and comity which require this court to defer to the State Judge's interpretation of State law.  Plaintiff cannot circumvent TEDA by premising a breach of employment contract claim on an alleged procedural due process violation.

Additionally, the County Board is entitled to summary judgment on Plaintiff's breach of contract claim because the County Board was not a party to the employment contract between Plaintiff and the District.

34

For those reasons, Plaintiff's breach of contract claim is dismissed.

## IV.    Civil Conspiracy

Similar to his breach of contract claim, in his civil conspiracy claim, the Plaintiff alleges "the individual Defendants acted in concert to deprive Dr. Howell of his due process right to a fair hearing on the issue of his suspension and the issue of his termination." [Amended Complaint, ¶ 54, Docket Entry #58].  The conspiracy claim does no more than incorporate the prior breach of contract allegations and then allege the existence of a civil conspiracy and pray for damages resulting from the conspiracy. *See Todd v. South Carolina Farm Bureau Mut. Ins. Co.*, 278 S.E.2d 607, 611 (S.C. 1981).  Again, it appears that Plaintiff's state law civil conspiracy claim is merely an attempt by Plaintiff to circumvent TEDA's exclusive appellate provision.

"The elements of a civil conspiracy in South Carolina are (1) the combination of two or more people, (2) for the purpose of injuring the plaintiff, (3) which causes special damages." *Pye v. Estate of Fox*, 633 S.E.2d 505, 511 (S.C. 2006).  "The gravamen of the tort of civil conspiracy is the damage resulting to the plaintiff from an overt act done pursuant to the combination, not the agreement or combination per se." *Pye*, 633 S.E.2d at 511.  Because the essence of a civil conspiracy claim is the damage resulting to the plaintiff, the damages alleged must go beyond the damages alleged in other causes of action. *Id.*

Plaintiff's civil conspiracy claim also fails because he has failed to allege special damages.  In his amended complaint, Plaintiff simply alleges he suffered damages as a result of the conspiracy.  In his memorandum in opposition to Defendants' motions for summary judgment, Plaintiff contends that his special damages are attorney's fees associated with his

suspension, termination, and this litigation, continuing damage to his reputation and substantially reduced earning power. Plaintiff has failed to allege damages that are specific to the conspiracy. The damages alleged do not go beyond the damages sought in the other claims. Accordingly, Plaintiff's civil conspiracy claim is due to be dismissed.

### Conclusion

For the reasons stated above, Defendant Marion County Board of Education's [Docket Entry #66] motion for summary judgment is **GRANTED**; Defendants Marion County School District One, Marion County School District One Board of Trustees, Cheryl Cook Allread, William A. Jones, Lynn McElveen, Gloria Woodberry, Paul DeMarco, and James Smith's ("District Defendants") [Docket Entry #67] motion for summary judgment is **GRANTED in part and DENIED in part**. To summarize, Plaintiff's First Amendment retaliation claim will proceed against the District Defendants. Summary judgment is granted in favor of the Defendants on all other causes of action.

**IT IS SO ORDERED**.


Florence, SC                                        s/R. Bryan Harwell
March 19, 2009                                     R. Bryan Harwell
                                                   United States District Judge

36